Affirmed and Memorandum Opinion filed June 19, 2007








Affirmed and Memorandum Opinion filed June 19, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00327-CR

____________

 

KEVIN ALLAN LINDSEY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 182nd
District Court

Harris County, Texas

Trial Court Cause No. 1059660

 



 

M E M O R A N D U M   O P I N I O N

A jury found appellant, Kevin Allan Lindsey, guilty of
felony murder and assessed his punishment at forty years= confinement in
the Institutional Division of the Texas Department of Criminal Justice, and a
$10,000 fine.  In two issues on appeal, appellant contends the evidence is
legally and factually insufficient to support his conviction.  We affirm.








Factual
and Procedural Background

The relevant facts are drawn from appellant=s trial in April
2006, twenty-two years after the crime for which he was indicted was
committed.  

In late February 1984, Elizabeth Gargano, age 71, was found
stabbed to death in her home on Maxey Road in east Harris County.[1] 
Blood and a pair of slippers were found on the porch, and from the pattern of
the blood, it appeared that Ms. Gargano had been dragged inside and left
there.  Her home appeared to have been ransacked and her phone was on the floor
with its cord ripped out of the wall.  Officers at the scene noted possible
points of entry through a window or the living room door, which had glass
broken out and appeared to have been forced.  Officer Stephen Fingerhut of the
Houston Police Department=s newly-formed Crime Scene Unit took
photographs of the crime scene and collected evidence for analysis, including
blood and fingerprints.[2] 
The evidence gathered was connected to the complainant only; no physical
evidence linking any suspects to the crime was found at the scene.  Ms. Gargano=s car, which was
missing, was later found about two miles from her home, burned.  An
investigation ultimately yielded no suspects.








Seventeen years later, in 2001, a man named Rick Moran
identified Gregory Helms and someone named AKevin,@ whose last name
was possibly ALindsey@ as suspects in
Ms. Gargano=s murder.  Helms and Lindsey were reportedly
brothers-in-law.  At appellant=s trial, Officer Paul Motard of the
Homicide Division, who had originally investigated Ms. Gargano=s death, testified
that Moran was in prison and offered the information in exchange for a transfer
to a prison unit closer to his family.  Officer Motard testified that he spoke
to Moran and was able to corroborate some of Moran=s information by
speaking to Lisa Vinson, who was Moran=s girlfriend in
1984.  Motard testified he eventually found Helms in 2004 living in Montgomery
County.  At first, Helms denied involvement, but later admitted involvement and
gave a statement.  Motard filed murder charges against him in June 2004. 

Motard also located appellant, who was then living in
Collinsville, Illinois.  In April 2005, Motard, his partner, Officer Clement
Abandado, and a Collinsville police officer, arrived at appellant=s trailer home. 
Appellant went with them to the police station, but made no admissions during
their conversation.  Motard then contacted appellant=s older sister,
Debbie Lindsey, who lived nearby, and told her he was investigating a 1984
murder in Houston.  When Motard told Debbie Lindsey that appellant denied any
involvement in the murder, she became very emotional and angry.  Debbie called
appellant and then led Motard and Abandado back to appellant=s trailer.








Debbie went into appellant=s house, and when
they both came out, appellant appeared Anervous, a little
rattled, and agitated.@  Motard secretly tape-recorded his
conversation with appellant, who was not under arrest at the time.[3] 
Motard testified that appellant told him that he was present at Ms. Gargano=s house, he and
Helms went there to do a burglary, he helped Helms get into the house through a
window, and he went around to the front of the house but did not go in. 
Appellant also said that he heard a commotion inside the house, and through the
front door he saw Helms with a knife and a woman lying on the floor.  At first,
appellant denied taking any property from the house and denied riding in Ms.
Gargano=s car with Helms. 
Later, however, appellant said he did ride with Helms in her car part of the
way, and then Helms let him out and he walked the rest of the way.  Appellant
also made a drawing of the house and the front door, and demonstrated where he
said he helped Helms into the window.[4] 
Motard testified that appellant told him that this had been bothering him for
some time and he had lost a lot of weight.  Motard also testified that
appellant=s description was accurate and consistent with the way
Motard had seen the scene.  According to Motard, appellant did not say he had a
knife that night, and he could not remember if appellant said he knew Helms had
a knife.

At trial, Debbie Lindsey testified that, when she lived in
Texas, she and Gregory Helms had a daughter together, and at one point,
appellant came to live with them at the Mimosa apartments.  During that time,
Debbie testified, Helms regularly abused drugs.  Helms also hung out with Rick
Moran, whom she did not like.  Debbie remembered hearing of Ms. Gargano=s murder on the
news one night.  She also testified that, several years after she and appellant
moved back to Illinois, appellant told her Athat him and Greg
did a robbery and something went wrong.@  When appellant
said this, he seemed Asick@ and Ashaken up.@  Debbie did not
inform the police.  She testified that after the homicide detectives from
Houston came to talk to her about the case, she called appellant because she
wanted him to talk with the police.

The State also called Gregory Helms to testify.  Helms
testified that in 1984 he used drugs on a regular basis, mainly marijuana,
pills, and occasionally acid.  He also drank beer.  He and Debbie lived at the
Mimosa apartments, which were not far from Ms. Gargano=s house. 
According to Helms, his home Awas a party@ and Rick and
Debbie were usually there.  Helms testified that he regularly did drugs with
Rick Moran and they would occasionally break into houses together.  








Helms testified that on February 26, 1984, he was hanging
out at his apartment with Rick, appellant, Debbie, and their baby.  He and Rick
came up with a plan to burglarize Ms. Gargano=s house that
evening to get money, and they chose it because Rick had burglarized it
before.  Although Debbie denied it at trial, Helms testified that all of them
were in the living room when they came up with the plan.  Helms testified he
and Rick dressed in dark clothes, oversized shoes (so that footprints could not
be accurately measured), and ski masks with holes in them.  Helms also wore
gloves and had a pocket knife he always carried.  The knife was a buck knife
with a six or seven-inch blade.  He testified the knife was visible from his
back pocket because it stuck out about an inch above the top of the pocket.  He
had the knife when he went to Ms. Gargano=s house.  Helms
testified that when he and Rick got there they broke in through a window.  But,
they retreated when they discovered Ms. Gargano was home.

Helms testified he and Rick returned to his apartment,
where Helms told appellant and Debbie he and Rick could not get into the house
because someone was there.  They sat around smoking marijuana and drinking, and
then Helms gave Rick a ride home.  After returning to the apartment, Helms,
appellant, and Debbie finished drinking and began discussing going back to Ms.
Gargano=s house to break
in.  Helms testified he believed Ms. Gargano was possibly still home, but he
went back because they needed money to get more drugs, beer, and cigarettes.  According
to Helms, appellant freely agreed to go with him.  Helms testified that he was
still carrying his knife when he went back the second time.  Like Helms,
appellant wore dark clothing, big shoes, a ski mask, and gloves.  Helms
testified appellant usually carried a fishing knife, but he did not know if
appellant had it with him when they went to break into Ms. Gargano=s house.  

Helms testified he entered Ms. Gargano=s house by
breaking the glass in a door with his knife, and appellant went in through a
window.  They were looking for money and things they could steal and sell. 
When they went to the bedroom, they found Ms. Gargano in bed, awake.  According
to Helms, she looked like an older lady, and appeared scared.  Helms started
yelling at her, demanding money and the keys to her car.  Appellant stood at
the foot of the bed.  Helms instructed appellant to keep Ms. Gargano there
while he went to the kitchen and started looking around for money.  When Helms
returned to the bedroom and began yelling again, Ms. Gargano jumped out of bed,
ran by appellant, pulled his mask off, and ran out the front door.  Helms and
appellant ran after her, and caught her when she fell off the porch steps.  Ms.
Gargano was screaming, and Helms was Afreaking out@ because she had
seen appellant=s face and he feared they would be caught.  He then
pulled out his knife and began stabbing Ms. Gargano in the back.  Helms
testified he did not know if appellant also had a knife at that time.








Appellant stood there as Helms stabbed Ms. Gargano several
times.  Appellant and Helms then dragged her into the house.  Ms. Gargano was
bleeding and moaning.  Helms then stabbed her five or six more times, he said Ato put her out of
her misery quicker.@  However, Helms admitted he did not stab
her as an act of mercy; he did it so they would not get caught.  Helms
testified he did not know if appellant also stabbed her.  He and appellant then
found Mrs. Gargano=s car keys, loaded some of her belongings
into the car, and left together.  

Helms testified he drove Ms. Gargano=s car to Rick
Moran=s house because
Rick could help them get rid of Ms. Gargano=s property.  Helms
told Rick he and appellant had killed Ms. Gargano.  Helms also told Rick he
thought appellant had raped her, but he admitted he never saw appellant do
that.  Rick told them to get rid of everything, so Helms and appellant went to
a nearby secluded area and burned the car.  He and appellant threw their bloody
clothes in the dumpster of the Mimosa apartments.  Helms also threw his knife
into the dumpster.  According to Helms, appellant never told him to stop stabbing
Ms. Gargano, he never tried to stop him, and he never ran away.  When they went
back to their apartment, Helms testified they told Debbie what had happened.  A
few weeks later, appellant returned to Illinois because he and Helms thought it
would be better if they split up.








Helms testified he was charged with and pleaded guilty to
Ms. Gargano=s murder.  He further testified he was never promised
anything in exchange for testifying.[5] 
Helms also testified that when he first spoke with Officers Motard and
Abandado, and when he was before the judge for sentencing, he continued to
maintain that he suspected appellant had raped Ms. Gargano, which was not
true.  Helms also falsely said that he saw appellant stab Ms. Gargano.  Helms
admitted that he said things that were not true concerning his and appellant=s participation in
the crime Ato get easier time.@  According to
Helms, after the prosecutor challenged his story, he ultimately told the truth
about what happened.

Appellant did not testify.  The jury found him guilty of
felony murder and, at the conclusion of the punishment phase, assessed his
punishment at forty years= confinement in the Institutional Division
of the Texas Department of Criminal Justice, and a $10,000 fine. 

Analysis
of Appellant=s Issues

In two issues, appellant challenges the legal and factual
sufficiency of the evidence to support his conviction for felony murder.  The
jury was authorized to find appellant guilty as a principal, as a party under
Texas Penal Code section 7.02(a)(2), or as a conspirator under section 7.02(b).[6] 
For purposes of our review, we will assume the evidence is insufficient to
support appellant=s conviction as principal and address
whether the evidence is sufficient to support his conviction under the law of
parties.

1.       The Legal
Sufficiency of the Evidence

A.      Standard
of Review

In evaluating the legal sufficiency of the evidence, we
must view the evidence in the light most favorable to the prosecution and
determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319 (1979); Vasquez v. State, 67 S.W.3d 229, 236 (Tex.
Crim. App. 2002).  Although we consider all evidence presented at trial, we may
not re-weigh the evidence and substitute our judgment for that of the jury.  King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).  The jury is the exclusive
judge of the credibility of witnesses and of the weight to be given their
testimony, and it is the exclusive province of the jury to reconcile conflicts
in the evidence.  Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996).  We must resolve any inconsistencies in the testimony in favor of the
verdict.  Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).








On appeal, the same standard of review is used for both
circumstantial and direct evidence cases.  Hooper v. State, 214 S.W.3d
9, 13 (Tex. Crim. App. 2007).  We look at events occurring before, during, and
after the commission of the offense and we may rely on actions of the defendant
which show an understanding and common design to do the prohibited act.  Id. 
Each fact need not point directly and independently to the guilt of the
appellant, as long as the cumulative force of all the incriminating
circumstances is sufficient to support the conviction.  Id. 
Circumstantial evidence is as probative as direct evidence in establishing the
guilt of an actor, and circumstantial evidence alone can be sufficient to
establish guilt.  Id. 

In a sufficiency review, the essential elements of the
offense are those of a hypothetically correct jury charge for the case.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  When the trial court=s charge
authorizes the jury to convict on more than one theory, as it did in this case,
the verdict of guilt will be upheld if the evidence is sufficient on any of the
theories.  Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992).

B.      Applicable
Law

A person commits the offense of felony murder if he commits
or attempts to commit a felony, other than manslaughter, and in the course of
and in furtherance of the commission or attempt, or in immediate flight from
the commission or attempt, he commits or attempts to commit an act clearly
dangerous to human life that causes the death of an individual.  Tex. Penal Code ' 19.02(b)(3).  A
person commits the felony offense of burglary if, without the effective consent
of the owner, he enters a habitation with the intent to commit theft.  Tex. Penal Code ' 30.02(a)(1), ' 30.02(c)(2).  








Under the law of parties, a person may be convicted as a
party to an offense if the offense is committed by his own conduct or by the
conduct of another for which he is criminally responsible.  Tex. Penal Code ' 7.01(a).   A
person is criminally responsible for an offense committed by another if, with
intent to promote or assist the commission of the offense, he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense.  Id. ' 7.02(a)(2).  A person is also criminally
responsible for an offense committed by the conduct of another if, Ain the attempt to
carry out a conspiracy to commit one felony, another felony is committed by one
of the conspirators, all conspirators are guilty of the felony actually
committed, though having no intent to commit it, if the offense was committed
in furtherance of the unlawful purpose and was one that should have been
anticipated as a result of the carrying out of the conspiracy.@  Id. ' 7.02(b). 

C.      Analysis
of Appellant=s Issue

Appellant contends the evidence is legally insufficient to
support his conviction as a party because there is no evidence that he
encouraged Helms to stab Ms. Gargano or that he should have anticipated the
commission of a murder in the course of the burglary.  Within his discussion of
this issue, appellant also argues that Helms=s accomplice
witness testimony is not credible and not corroborated, appellant=s confession is
insufficient to support his conviction alone or to corroborate Helms=s testimony, and,
even if Helms=s testimony and appellant=s confession were
sufficient, this evidence proves only that appellant may have been present at
the scene of the crime.  We disagree.








Evidence is sufficient to convict under the law of parties
when the defendant is physically present at the commission of the offense and
encourages its commission by words or other agreement.  Ransom v. State,
920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (op. on reh=g).  In Loredo
v. State, we considered a similar claim of legally insufficient evidence to
support a felony murder conviction.  See Loredo v. State, 130 S.W.3d 275
(Tex. App.CHouston [14th Dist.] 2004, pet. ref=d).  In that case,
the defendant and two other men set out to burglarize a McDonald=s restaurant.  Id.
at 277.  In order to avoid leaving physical evidence at the scene, a
co-defendant set fire to the restaurant.  Id. at 278.  As the restaurant
began to burn, the fire department was called.  Two firefighters entered the
restaurant to ensure no one was trapped inside, and while searching the
restaurant, they suffered asphyxia and died.  Id.  On appeal, the
defendant claimed the evidence was insufficient to support his conviction as a
party to felony murder because starting the fire was an independent act of a
co-defendant done without his knowledge.  In determining the evidence was
legally sufficient to support the jury=s verdict, this
Court considered the fact that the defendant knew the restaurant was on fire
and did not try to put the fire out or call the fire department, and that the
fire was started to destroy any evidence that the defendant and others
participated in a burglary.  Id. at 280.  

The evidence here demonstrates that both appellant and
Helms went to Ms. Gargano=s house, uninvited, to steal money and other
items, thereby committing the offense of burglary.  In the course of and in
furtherance of the commission of the burglary, Helms stabbed Ms. Gargano
multiple times, causing her death.  Because Helms told appellant he and Moran
had abandoned an earlier attempt to break into Ms. Gargano=s house because
she was not home, and yet they planned to return to the house, the jury could
have determined that appellant knew Ms. Gargano was home when he and Helms went
to her house.  He watched over Ms. Gargano while Helms looked for money in the
house.  After Ms. Gargano pulled off appellant=s ski mask and
attempted to escape, appellant ran outside to aid Helms in getting her back
inside the house.  Once Helms stabbed Ms. Gargano, he and appellant carried her
back inside so that no one could see or hear her.  Helms then stabbed Ms.
Gargano several more times, and appellant made no attempt to stop Helms, to get
help for Ms. Gargano, to leave, or to contact the police.  Instead, appellant
and Helms then ransacked the house, stole Ms. Gargano=s property,
including her car, and left her for dead.  In a panic, they went to Rick Moran=s house for advice
and then decided to burn Ms. Gargano=s car.  Helms
testified that he stabbed the gas tank and cut the lines, while both he and
appellant put newspapers underneath the seats of the car and lit them on fire. 
Helms and appellant then disposed of their bloody clothes and Helms=s knife in a
dumpster.  








Although appellant contends Helms=s testimony is not
credible because he had previously lied under oath, the jury is the exclusive
judge of the credibility of witnesses and of the weight to be given testimony,
and it is also the exclusive providence of the jury to reconcile conflicts in
the evidence.  Jones, 944 S.W.2d at 647.  Viewed in the light most
favorable to the verdict, a rational trier of fact could have found beyond a
reasonable doubt that appellant, while in the course of committing burglary,
was a party to the stabbing, an act clearly dangerous to human life, which
caused Ms. Gargano=s death.

Likewise, the jury could have concluded the act of stabbing
Ms. Gargano was committed in furtherance of the conspiracy to commit burglary,
because Ms. Gargano was attempting to escape and could identify appellant.  Her
death enabled appellant to avoid prosecution for this crime for over twenty
years.  See Flores v. State, 681 S.W.2d 94, 96 (Tex. App.CHouston [14th
Dist.] 1984), aff=d, 690 S.W.2d 281
(Tex. Crim. App. 1985) (holding evidence was legally sufficient to support
defendant=s conviction when co-defendant=s shooting of
complainant who came home during burglary was committed in furtherance of
burglary).  And, although appellant claims he could not have anticipated the
stabbing, Helms testified he always carried the knife in his back pocket, where
it was visible, and he used it that night to break the glass in Ms. Gargano=s door.  This
evidence is sufficient to enable the jury to reasonably conclude that appellant
should have anticipated the stabbing.  See Hooper, 214 S.W.3d at 14B15 (AJuries are
permitted to make reasonable inferences from the evidence presented at trial,
and circumstantial evidence is as probative as direct evidence in establishing
the guilt of an actor.@); Loredo, 130 S.W.3d at 281
(holding defendant should have anticipated fire being set to cover conspirators= participation in
burglary); Flores, 681 S.W.2d at 281 (holding burglary conspirator
should have anticipated shooting of complainant when he knew co-conspirator had
gun); see also Green v. State, 682 S.W.2d 271, 285B86 (Tex. Crim.
App. 1984) (holding evidence that appellant agreed to burglarize house,
participated in robbery during which complainant was murdered, and entered
house with a gun was legally sufficient to show appellant should have
anticipated murder); Moore v. State, 24 S.W.3d 444, 447 (Tex. App.CTexarkana 2000,
pet. ref=d) (holding
evidence legally sufficient to support conviction because burglary conspirator
should have anticipated co-conspirator might arm himself with items or weapons
found in burglarized residence).








Appellant also claims the evidence is legally insufficient
because the State did not present evidence to corroborate Helms=s incriminating
testimony.  See Tex. Code Crim.
Proc. art. 38.14 (AA conviction cannot be had upon the
testimony of an accomplice unless corroborated by other evidence tending to
connect the defendant with the offense committed; and the corroboration is not
sufficient if it merely shows the commission of the offense.@). The accomplice
witness rule imposes a sufficiency review that would not otherwise be conducted
by appellate courts.  Taylor v. State, 10 S.W.3d 673, 684 (Tex. Crim.
App. 2000).  In conducting a sufficiency review under the accomplice witness
rule, the reviewing court must eliminate the accomplice testimony from
consideration and then examine the remaining portions of the record to
ascertain if there is any evidence that tends to connect the accused with the
commission of the crime.  Solomon v. State, 49 S.W.3d 356, 361 (Tex.
Crim. App. 2001); Hernandez v. State, 939 S.W.2d 173, 176 (Tex. Crim.
App. 1997).  ATendency to connect@ rather than
rational sufficiency is the standard: the corroborating evidence need not be
sufficient by itself to establish guilt beyond a reasonable doubt.  Solomon,
49 S.W.3d at 361; Cathey v. State, 992 S.W.2d 460, 462B63 (Tex. Crim.
App. 1999).  Rather, if the combined weight of the non-accomplice evidence
tends to connect the defendant to the offense, the requirement of Article 38.14
has been fulfilled.  Cathey, 922 S.W.2d at 462.  All the facts and
circumstances in the case may be considered when determining whether the
accomplice testimony was properly corroborated.  Reed v. State, 744
S.W.2d 112, 126 (Tex. Crim. App. 1988).  Even apparently insignificant evidence
of incriminating circumstances may sometimes afford satisfactory evidence of
corroboration.  Trevino v. State, 991 S.W.2d 849, 852 (Tex. Crim. App.
1999).








Turning to the corroborating evidence, in 2001, Officer
Motard received information from Rick Moran, an acquaintance of appellant and
Helms, implicating appellant and Helms in Ms. Gargano=s murder.  The
information provided Moran corroborated Helms=s version of
events.  Additionally, the State presented a recorded statement from appellant
in which he admitted going to Ms. Gargano=s house to commit
burglary.  Appellant=s statement was consistent with eyewitness
and photographic evidence of the crime scene.  Although some of the details
varied from Helms=s testimony, the jury was free to weigh
the evidence and determine the credibility of the witnesses.  Appellant=s sister, Debbie
Lindsey, testified appellant told her he and Helms had committed the burglary
and something had gone wrong.  She recalled appellant was very shaken by the
incident and she later convinced him to talk to the police about his
involvement in the case.  Disregarding Helms=s testimony and
reviewing the remaining evidence, we conclude there is some evidence that tends
to connect appellant with the offense.  See Flores, 681 S.W.2d at 97; see
also Joseph v. State, 960 S.W.2d 363, 365B66 (Tex. App.CHouston [1st
Dist.] 1998, pet. ref=d) (holding evidence sufficiently
corroborated testimony of accomplice regarding convenience store robbery and
murder when evidence placed defendant at the crime scene and a witness
testified defendant was with the accomplice on the day of the robbery).

In summary, viewing the evidence in the light most
favorable to the verdict, the jury could have found that appellant, acting as a
party, committed the offense beyond a reasonable doubt, even in the absence of
evidence that he personally stabbed Ms. Gargano.  We overrule appellant=s first issue.

2.       The
Factual Sufficiency of the Evidence

A.      Standard
of Review








When conducting a factual-sufficiency review, we view all
of the evidence in a neutral light.  See Cain v. State, 958 S.W.2d 404,
408 (Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d 126, 134 (Tex.
Crim. App. 1996).  We may set the verdict aside if (1) the evidence is so weak
that the verdict is clearly wrong and manifestly unjust, or (2) the verdict is
against the great weight and preponderance of the evidence.  Watson v.
State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (citing Johnson v.
State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)).  However, while we may
disagree with the jury=s conclusions, we must exercise
appropriate deference to avoid substituting our judgment for that of the jury,
particularly in matters of credibility.  Drichas v. State, 175 S.W.3d
795, 799 (Tex. Crim. App. 2005); see also Watson, 204 S.W.3d at 414
(stating that a court should not reverse a verdict it disagrees with unless it
represents a manifest injustice even though supported by legally sufficient
evidence).  Thus, while we are permitted to substitute our judgment for the
jury=s when considering
credibility and weight determinations, we may do so only to a very limited
degree.  Marshall v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

B.      Analysis
of Appellant=s Issue

In his second issue, appellant contends the evidence is
factually insufficient because there was no DNA or fingerprint evidence to
connect appellant to the crime.  Appellant also re-urges that Helms=s testimony was
not credible and there was no evidence corroborating it.  Again, we disagree.

While scientific evidence is useful, the State can meet its
burden without such evidence, especially in light of the evidence of appellant=s guilt in this
case.  The lack of scientific evidence does not make the State=s evidence so weak
as to be clearly wrong or manifestly unjust, or render the verdict against the
great weight and preponderance of the evidence.  A rational jury could have
found appellant guilty of felony murder without DNA or fingerprint evidence.  See
Santos v. State, 116 S.W.3d 447, 459 (Tex. App.CHouston [14th
Dist.] 2003, pet. ref=d) (rejecting argument that lack of
fingerprints connecting defendant to robbery rendered evidence insufficient to
support conviction); Washington v. State, 127 S.W.3d 197, 205 (Tex. App.CHouston [1st
Dist.] 2003, pet. dism=d as untimely filed) (rejecting argument
that there was no medical or scientific evidence supporting conviction for
aggravated sexual assault). 








We have already addressed appellant=s complaints about
Helms credibility and outlined the evidence corroborating his testimony. 
Although Helms=s testimony was contradictory at times, reconciliation
of conflicts in the evidence is within the exclusive province of the jury.  See
Jones, 944 S.W.2d 647; Reed v. State, 158 S.W.3d 44, 51 (Tex.
App.CHouston [14th
Dist.] 2005, pet. ref=d).  Helms admitted that when he was
initially charged with this offense, he told investigators that appellant
stabbed Ms. Gargano.  He also accused appellant of raping Ms. Gargano, which
was not true.  However, Helms admitted his earlier statements were untrue and
he explained that he lied in the hopes of getting a lighter sentence.  Helms
also testified that his testimony at appellant=s trial was the
truth.  Helms=s trial counsel, Jay Dedrick, and Officer Motard also
testified that Helms was not offered or given anything in exchange for
testifying against appellant.  By rendering a guilty verdict, the jury chose to
accept the truthfulness of Helms=s testimony,
despite any inconsistencies.  The jury also was free to consider and weigh the
corroborating evidence presented.  On this record, we decline to substitute our
judgment for the jury=s on this matter of credibility and
weight.  See Marshall, 210 S.W.3d at 625 (appellate court may substitute
its judgment for jury=s on matters of weight and credibility
only to a very limited degree).  We hold the evidence is factually sufficient
to support appellant=s conviction.  Therefore, we overrule
appellant=s second issue.

The trial court=s judgment is
affirmed.

 

 

 

/s/      Margaret Garner Mirabal

Senior Justice

 

 

Judgment rendered and Memorandum
Opinion filed June 19, 2007.

Panel consists of Justices Anderson
and Frost and Senior Justice Mirabal.[7]

Do Not Publish C Tex.
R. App. P. 47.2(b).









[1]  At appellant=s trial, the medical examiner
testified Ms. Gargano had a total of eleven stab wounds and one puncture wound.






[2]  DNA testing was not used at the time; the blood was
submitted to determine its type.  In 2005, DNA testing was done on various
samples from the crime scene, but nothing connecting to any suspects was found.





[3]  The tape recording was admitted as a State=s exhibit and played for the jury.





[4]  The drawing was admitted into evidence.





[5]  The State also called Jay Dedrick, Helms=s attorney.  Dedrick testified that Helms was never
promised anything in exchange for testifying against appellant, and the
sentencing was left entirely to the judge.  Likewise, Officer Motard testified
that, between June 2004 and April 2005, he had one meeting with Helms before he
was sentenced, and Helms was not promised anything in exchange for testifying
against appellant.





[6]  The jury charge also included the lesser offense of
burglary of a habitation.





[7]  Senior Justice Margaret G. Mirabal sitting by
assignment.